Filed 7/29/14  In re Robert J. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ROBERT J. et al., Persons Coming Under the Juvenile Court Law. | B252577 (Los Angeles County Super. Ct. No. CK86605) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MARTHA M.,<br><br>Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Jacqueline H. Lewis, Juvenile Court Referee.  Affirmed.

M. Elizabeth Handy, under appointment by the Court of Appeal, for Defendant and Appellant.

Arezoo Pichvai for Plaintiff and Respondent.

_____

Martha M. (Mother) challenges a dependency court order finding her biological children adoptable and terminating her parental rights.  Finding no error, we affirm.

**FACTS**

This matter came to the attention of the Department of Children and Family Services (DCFS) on February 10, 2011.  Three-year-old Robert J., accompanied by Mother, was brought to the emergency room suffering from second and third degree burns on both hands and wrists.  Other marks and bruises were observed on Robert's body.  Mother told three different, conflicting stories about how Robert was burned.  Due to the burns, multiple surgeries would be required in an attempt to reconstruct Robert's left hand.

Robert's sister Genesis, two, was later found in the care of Mother's boyfriend, Jonathan G. Marks.  Bruises were also observed on Genesis's body, and she was transported to the hospital.  X-rays revealed multiple fractures in her arms, as well as a collapsed lung caused by blunt force trauma to the chest.  She also had a large bite mark on the back of her arm.

Eventually, Mother reported that Jonathan had caused the burns to Robert.  Mother said she was very afraid of Jonathan.  Jonathan was not the father of either Robert or Genesis, but Mother was three months pregnant by Jonathan.  The father of Robert and Genesis was in prison, serving a long-term sentence.

On February 15, 2011, DCFS filed a petition pursuant to Welfare and Institutions Code section 300, subdivisions (a), (b), (e), (g), (i), and (j).[1]  The petition alleged, in part, that Genesis suffered:  fractures to her left radius and left ulna; fractures to her right radius and ulna; traumatic chest trauma with a collapsed right lung; swelling and bruising to the left cheek, right cheek, and forehead; bruising on her neck; bruising on her foot; and bruising from her abdomen to labia majora.  The petition further alleged that Jonathan inflicted third degree burns to Robert's left hand and second degree burns to his

---

[1]     All further statutory references are to the Welfare and Institutions Code.

2

right hands by forcibly immersing Robert's hands in scalding water. Surgery was required to provide blood flow to Robert's left hand and he would require ongoing surgery and skin grafts. The dependency court ordered the children detained and Mother was granted monitored visitation.

As of March 18, 2011, Robert was still hospitalized. He had undergone seven surgeries to attempt to restore the use of his hands and arms. It was anticipated that parts of his fingers would need to be amputated because of the injuries he sustained. Genesis was in a medical placement with a Ms. B. Mother reported that Jonathan had pulled Genesis's arms out of place in January 2011 and hit Genesis in the chest. Mother also reported that Jonathan often hit her in front of the children.

Robert exhibited developmental delays and it was often difficult to understand his speech. He spoke at about a two-year-old level. Genesis was also diagnosed as developmentally delayed in fine motor skills and speech.

In April 2011, the dependency court sustained the section 300 petition under subdivisions (a), (b), (e), (g), (i), and (j). In May 2011, the court declared the children dependents of the court and denied Mother reunification services pursuant to section 361.5, subdivision (b)(5).[2]

As of June 2011, Robert and Genesis were in medical placement with Ms. B. Ms. B. told a social worker that she was not interested in adopting the children due to her age, though they were a joy and a pleasure to have in her home. She had adopted another school-age child with autism who required a lot of care and attention. Ms. B. met the children's physical, emotional, and educational needs, and they appeared to have a genuine bond. Robert called Ms. B. "mama," and Genesis was attached to her, as well.

---

[2]     Section 361.5, subdivision (b)(5) allows the court to deny reunification services when it finds, by clear and convincing evidence, that a parent's conduct brought the child within the jurisdiction of the court under section 300, subdivision (e)—child under five years old suffering severe physical abuse.

A social worker spoke with the children's paternal aunt, who stated that she was eager to care for Robert and Genesis. The aunt lived with her sister and their stepmother. The stepmother was informed that a criminal waiver would have to be completed before the children could possibly be placed with them. Robert and Genesis were unfamiliar with the aunt and the others in her household because Mother had only allowed the children to visit the maternal grandmother.

Robert was in therapy. When the therapist asked Robert to draw a picture of his family, he drew a picture of himself, Genesis, and Ms. B. The therapist stated that, since being placed with Ms. B., Robert's speech and language ability had improved significantly.

A social worker completed an adoption assessment for Robert in June 2011 and recommended adoption. Robert was observed to be physically healthy, personable, able to play independently, and to eat well. He had problems with enuresis and speech delay. The social worker noted that Ms. B. was not interested in adopting Robert but would continue to foster him. One of Robert's fingers, along with three fingertips, had been amputated. The social worker further explained that Robert's extended family members had an extensive history with DCFS.

An assessment was also completed for Genesis. She appeared physically healthy, personable, able to play independently and eat well, and she related well to others. However, she had sleeping problems and speech delay.

On August 27, 2011, Mother gave birth to D. G. On September 1, 2011, a dependency petition was filed on his behalf. The dependency court ordered D. detained in foster care and granted Mother monitored visits.

As of September 2011, Robert and Genesis continued to receive therapy. Their therapist reported that they appeared to be making progress in all areas. Mother had not maintained contact with either of them. The paternal aunt's household members had completed live scans, but one had still not completed a required criminal waiver.

On September 7, 2011, Mother was incarcerated for child abuse and cruelty.

Robert and Genesis were matched with a prospective adoptive family in December 2011 but, because of the children's needs, the family decided not to proceed with possible adoption. DCFS continued to recruit potential adoptive families, including by displaying pictures of the children at recruitment and adoption events. The adoption coordinator opined that because of the children's medical and emotional needs, it would take time to find an appropriate family. Robert and Genesis continued to do well with Ms. B. Robert was a Regional Center client and had been recently diagnosed with mild mental retardation. He was in physical therapy three times a week. Both children were in speech therapy twice a week. The children's speech therapist reported that they were "progressing in leaps and bounds."

In January 2012, the children's paternal aunt indicated that she was still interested in caring for the children. She was in the process of moving to her own two-bedroom apartment. Mother's aunt was also contacted and expressed an interest in caring for the children. However, her husband had recently suffered a stroke and she was providing 24-hour care for him. Ms. B.'s nephew and his wife, Mr. and Mrs. S., also expressed interest in adopting Robert and Genesis, but their home did not have space to accommodate the children at the time. Robert and Genesis were matched with another prospective adoptive couple in January 2012, but the couple did not feel they could meet the children's needs.

On February 7, 2012, D. was declared a dependent of the court under section 300, subdivisions (b), (g), and (j). The dependency court denied reunification services to Mother. An adoption assessment was completed for D. He was reported to be developmentally age appropriate and likely to be adopted.

As of April 2012, Robert could walk without difficulty. He used his right hand to manipulate objects but had limited use of his left hand due to the severe burns he suffered. He was toilet trained but needed assistance completing the task. He could put on his socks and shoes with assistance. He also required assistance in brushing his teeth, washing his face and hands, and bathing. He had good receptive skills.

In July 2012, DCFS reported that Ms. B.'s relatives, Mr. and Mrs. S., continued to express an interest in adopting Robert and Genesis. Mr. S. informed the social worker

5

that he was remodeling his home to make it large enough to accommodate the children and their younger brother D. Meanwhile, Ms. B. provided excellent care and structure, took Robert to the park and on family outings, and kept all of Robert's medical and therapy appointments. Ms. B. was medically trained to meet Robert's medical needs. Both Robert and Genesis were well bonded to her. Robert had surgery to help un-web the thumb of his left hand, and he could use the thumb to pinch. Robert was a happy, active, and curious child. He was able to speak using three to four words to express his needs, but he required verbal prompts to develop sentences. In his special education classroom at school he was initially very shy, but eventually he talked with peers and participated in every activity.

In September 2011, Mr. and Mrs. S. reported that they completed construction to their home and now had the space to accommodate all three children. Mr. and Mrs. S. had maintained regular contact with the children, who were very familiar and friendly with the family. D. lived in the home of Loretta B. on the same street as Ms. B., and the children regularly visited each other.

As of May 2013, Robert's speech continued to dramatically improve. He could speak using 15-20 words to express his needs. Mr. and Mrs. S.'s home had been assessed and approved. However, in March 2013, a visit raised some concern about whether Mr. and Mrs. S. could care for Robert and his two siblings. In addition, Ms. B. had concerns about Mr. and Mrs. S.'s ability to care for the children. Ms. B. informed the social worker that she and her daughter were interested in adopting all three children.

An October 1, 2013 report stated that Ms. B. explained that she planned on adopting the children, and that her adult daughter would be used as a "back-up plan" to care for the children instead of becoming a co-adoptive parent. Ms. B.'s adoption home study was pending. DCFS recommended that the section 366.26 hearing be continued for 60 days for completion of the adoptive home study.

The dependency court held the section 366.26 hearing on October 1, 2013. DCFS requested that the court terminate parental rights, arguing that the children were both generally and specifically adoptable, as their caregiver wanted to adopt them. Mother's

6

counsel objected to termination, arguing that the children were not generally or specifically adoptable.

The dependency court found that the children were adoptable, stating that "in spite of the medical conditions caused by their biological parents," they were in a home with a caretaker who wished to adopt them and was making progress toward adoption. The court found that physical injuries did not make the children less adoptable. The court further stated, "I will note that, while this court is often a little . . . wary of making children legal orphans in case something happens to an adoption, in this particular case, with these facts, these children are better off. In addition, legal safeguards are in place that, if adoption were not to finalize within three years, then the children could petition to have parental rights reestablished." The court then terminated parental rights and freed the children for adoption.

Mother timely appealed.

## **DISCUSSION**

Mother contends that the order terminating her parental rights was improper because substantial evidence did not support a finding by clear and convincing evidence that the three children were likely to be adopted within a reasonable time.

At a section 366.26 hearing, the juvenile court must select and implement a permanent plan for the dependent child. "Where there is no probability of reunification with a parent, adoption is the preferred permanent plan." (*In re Tabatha G.* (1996) 45 Cal.App.4th 1159, 1164.) "[C]onsideration of the child's best interests is inherent in the legislative procedure for selecting and implementing a permanent plan." (*Id.* at p. 1165; see also *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 427.) If a child is likely to be adopted, parental rights must be terminated unless one of several enumerated exceptions applies. (§ 366.26, subd. (c)(1); see *In re Jasmine J.* (1996) 46 Cal.App.4th 1802, 1807.) Here, Mother does not urge any statutory exception, but rather contends that substantial evidence does not support the juvenile court's finding of adoptability.

On appeal, we view the evidence in the light most favorable to the trial court's order, drawing every reasonable inference and resolving all conflicts in support of the

7

judgment. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.) An appellate court does not reweigh the evidence. (See *In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.) Rather, we must determine whether there is substantial evidence from which a reasonable trier of fact could by clear and convincing evidence find a factual basis for the finding as to the child's adoptability. (*In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.)

"'The issue of adoptability posed in a section 366.26 hearing focuses on the *minor*, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor.'" (*In re I.I.* (2008) 168 Cal.App.4th 857, 870.) A child need not be in a potential adoptive home to be considered adoptable, nor must there be "a proposed adoptive parent 'waiting in the wings.'" (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.)

Here, substantial evidence supports the dependency court's finding that Robert, Genesis, and D. were likely to be adopted. Ms. B., the long-term caretaker of Robert and Genesis, expressed a desire to adopt the children. The fact that she wanted to adopt the children by itself constitutes evidence that the children were likely to be adopted. "Usually, the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*." (*In re Sarah M.*, *supra*, 22 Cal.App.4th 1642, 1649-1650.) In addition to Ms. B., Mr. and Mrs. S. also expressed a desire to adopt the children, and even remodeled their house in anticipation of the potential adoption. The totality of this evidence leads to the conclusion that the children were adoptable.

Mother argues that, because of Robert's physical injuries and delayed developmental status, as well as the relatively advanced age of both Robert and Genesis, they were not "generally adoptable" and at most could only be considered "specifically adoptable"—i.e., "not generally adoptable because of age, poor physical health, physical disability or emotional instability" but nevertheless "adoptable because a prospective

8

adoptive family has been identified as willing to adopt the child." (*In re R.C.* (2008) 169 Cal.App.4th 486, 494.) The trial court need not make an explicit finding that a child is either generally or specifically adoptable, however. (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1313.) "All that is required is clear and convincing evidence of the likelihood that the dependent child will be adopted within a reasonable time." (*Ibid.*) Substantial evidence supported the trial court's finding that the children were adoptable, and that "in spite of the medical conditions . . . that they are in a home that wishes to adopt them and is making progress towards that adoption. These children—their physical injuries do not make them less adoptable."

Mother further contends that the trial court's order was premature because no home study had been completed for Ms. B. and there was no detailed assessment of Ms. B.'s ability to function as an adoptive parent. The lack of any such reports, however, did not prevent the dependency court from terminating Mother's parental rights. "[T]here is no requirement that an adoptive home study be completed before a court can terminate parental rights." (*In re Marina S.* 2005) 132 Cal.App.4th 158, 166.) Moreover, "the question of a family's suitability to adopt is an issue which is reserved for the subsequent adoption proceeding." (*In re Scott M.* (1993) 13 Cal.App.4th 839, 844.)

Finally, the facts of this matter are distinguishable from cases in which judgments terminating parental rights were reversed. In *In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1205, the dependency court's finding of adoptability was based on the willingness of the mother's former boyfriend to adopt the child. But, as noted by the appellate court, the former boyfriend had a history of domestic violence in the presence of children, had been convicted three times for domestic violence, and had emotionally abused his nephews and nieces. (*Id.* at p. 1202.) Moreover, the child still maintained a close relationship with his mother, to the point that the appellate court found that they had a beneficial relationship. (*Id.* at p. 1205-1207.) In contrast to the former boyfriend in *Jerome D.*, Ms. B. provided excellent care and structure to Robert and Genesis, and each child had progressed rapidly under her care. And this matter does not involve a biological mother who is closely involved with her children. Despite being granted

9

visitation, Mother failed to maintain contact with Robert or Genesis. Not surprisingly, when asked to draw a picture of his family, Robert drew himself with Genesis and Ms. B., not Mother.

In re Valerie W. (2008) 162 Cal.App.4th 1, is also inapposite. The appellate court in that matter found: "Where, as here, the record suggests the child has been or will be tested for a serious genetic or neurological disorder, a lack of evidence concerning the child's condition, prognosis and treatment needs, if any, undermines the basis for the determination that a prospective adoptive parent is capable of meeting that child's needs." (Id. at p. 14.) In the instant matter, Robert's and Genesis's physical and developmental issues were thoroughly detailed in the records provided to the court. The record also demonstrates that Robert has some special needs, but Ms. B., who has medical training, is equipped to handle them.

Accordingly, substantial evidence supports the dependency court's determination to terminate parental rights and free the children to have a permanent home through adoption.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


CHAVEZ, J.


FERNS, J.*

_____

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.